U.S. DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
DEC 10 2009
CHRIS R. JOHNSON, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | |
|---|---|
| DAVID RUSSELL RODGERS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>REMINGTON ARMS COMPANY, INC.<br><br>Defendant. | Civil Action No. 09-1054<br>JURY TRIAL |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

COMES NOW Plaintiff, David Russell Rodgers, individually, and on behalf of all others similarly situated, and complains of Remington Arms Company, Inc. ("Remington"), Defendant, and files this, his Original Class Action Complaint, and for his cause of action would show the Court and the jury the following:

I.

JURISDICTION AND VENUE

1.  This is a nationwide class.

2.  Members of the proposed Class are citizens of the states of the United States.

3.  The jurisdiction of this Court attaches under the provisions of 28 U.S.C.§1332, in that this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs, and Plaintiff is a citizen of a state different from Defendant.

4.  Federal court jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d), 1453 & 1711-1715, and venue is proper according to 28 U.S.C. §1391 (a) and (c) in a federal forum located in an area where a defendant is deemed to reside and subject to

personal jurisdiction based on Defendant's contacts with the forum. Remington has continuous and systematic contacts with the Western District of Arkansas, El Dorado Division, and throughout the United States.

5. The Western District of Arkansas, El Dorado Division, has jurisdiction over this action and the Western District of Arkansas is also a proper venue under 28 U.S.C. §1391(a) and (c). In this cause, there is only one Defendant, Remington, so all defendants reside in the same state. 28 U.S.C. §1391(a)(1). Further, for purposes of the federal venue statute, Remington is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. §1391(c). Remington currently sells its firearms products throughout the Western District of Arkansas, El Dorado Division. Thus, Remington's contacts with the Western District of Arkansas are continuous and systematic. Venue is proper in the Western District of Arkansas, El Dorado Division.

## II.

## PARTIES

6. Plaintiff David Russell Rodgers ("Rodgers") is a citizen of the State of Arkansas and resides in Ashley County, Arkansas.

7. The "Members of the Class" are all natural persons within the United States who purchased a new Remington Model 700 bolt action rifle containing a "Walker" control fire control system (the "Subject Rifles") within the last five years, and continuing until a Class is certified, or who now own a Remington Model 700 bolt action rifle containing a "Walker" control fire control system purchased within that time period. Excluded from the class is Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns and successors. Also

excluded is the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff. The U.S. Military and all Government agencies and departments, federal, state, and local are excluded. Claims for personal injury are specifically excluded from the Class. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, Plaintiff is informed and reasonably believes the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

8.   Defendant Remington Arms Company, Inc. is a corporation foreign to the State of Arkansas being organized and incorporated under the laws of the State of Delaware and having its principal place of business in North Carolina. At all times relevant to this action, Remington was doing business in the State of Arkansas by selling, manufacturing and distributing rifles through its sales channels.

### III.

### FACTUAL BACKGROUND

9.   On or about December 12, 2006, Rodgers purchased a new Model 700 Remington bolt action rifle for more than $400 with serial number G 6576270. The gun was purchased for personal, family, or household use. The Model 700 Remington bolt action rifle Rodgers purchased contains a "Walker" fire control system and is one of the Subject Rifles.

10.   Remington is engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did manufacture, distribute, sell, and place into the stream of commerce the Remington Model 700 bolt action rifle including the action, fire control system, and safety (previously defined as "Subject Rifles"), knowing and expecting that

3

the rifle would be used by consumers and around members of the general public.

11. The Subject Rifles contain a dangerously defective "Walker" fire control system that may (and often does) fire without a trigger pull upon release of the safety, movement of the bolt, or when jarred or bumped.

12. All 700's now have the new fire control. The Walker fire control is still in use in military rifles and Model 770s. Remington has designed a new trigger mechanism that is safe (and that represents a safer alternative design), but it has only installed the new mechanism into some of its rifles (not the rifles that are the subject of this class action).

13. Despite a defect that has been known to Remington for sixty years—a defect resulting in over 4,000 documented complaints of unintended discharge, many jury verdicts finding that the design is defective (including at least 2 findings of gross negligence), and more than $20 million in settlements paid to injured consumers since 1993—millions of unsuspecting users hunt today with a rifle that will fire absent a trigger pull.

14. Remington redesigned its fire control mechanism, but perceived financial strain prevents Remington from recalling millions of rifles it knows are dangerous and defective. This "profits over people" or "profits over safety" mentality is exactly the conduct that this action is designed to prevent.

15. Over 100 injured individuals have sued or made claims against Remington over the same defective design, and several juries, including at least two federal court juries, have found Remington's fire control to be defective.

16. As early as January 25, 1990, an internal Remington memo reveals: "The number of Model 700 rifles being returned to the factory because of alleged accidental firing malfunctions is constantly increasing. 170 were returned to Product Service for examination in

1989 with various accidental firing complaints. To date this year, 29 have been returned." Ignoring thousands of customer complaints, however, Remington refuses to recall its rifles or warn its customers.

17.     Remington's defective trigger mechanism uses an internal component called a "connector"—a design component not used by any other rifle manufacturer. The connector floats on top of the trigger body inside of the gun, but it is not physically bound to the trigger in any way other than spring tension. The connector cannot be seen or controlled by the gun handler. When the trigger is pulled, the connector is pushed forward by the trigger, allowing the sear to fall and the rifle to fire.

18.     The proper position of the connector under the sear requires an overlap—or "engagement"—of only approximately 25/1000ths of an inch (half the width of a dime or eight human hairs). But because the connector is not bound to the trigger, during the recoil action after each firing of the rifle, the connector separates from the trigger body several times and creates a gap between the two parts. This separation is recorded in Remington's own high-speed video footage of the fire control during discharge. Any dirt, debris or manufacturing scrap can then become lodged in the space created between the connector and the trigger, preventing the connector from returning to its original position.

19.     Remington's own experts have admitted the existence of this dangerous condition:

> Q.  From a performance standpoint, the trigger connector, by the time the Model 710 was introduced, did nothing to truly enhance performance.
>
> A.  I think that's true.
>
> Q.  Are there any circumstances, in your judgment or experience, depending upon, you know, again, what other factors may be at play, where the trigger connector does increase the risks or the safety concerns with use of

5

> the Walker fire-control system?
>
> A. It theoretically adds one more point at which you could put in debris and prevent the connector from returning underneath the sear, and that is between the trigger and the connector.
>
> Q. Let me see if I understand what you just said. On a theoretical level, the trigger connector does present a moving part that under certain circumstances could result in debris getting between the trigger connector and the trigger body, correct?
>
> A. Right.

Deposition of Remington liability expert Seth Bredbury, *Williams v. Remington.*

20. When enough displacement occurs, the connector will no longer support the sear (either no engagement is present, or insufficient engagement is present) and the rifle will fire without the trigger being pulled. This can occur in a variety of ways including when the safety is released, when the bolt is closed, or when the bolt is opened. These unintended discharges occur so frequently that Remington actually created acronyms for internal use (Fire on Safe Release—"FSR"; Fire on Bolt Closure—"FBC"; Fire on Bolt Opening—"FBO"; and Jar Off—"JO"). The various manifestations notwithstanding, all of the unintended discharges result from the same defective condition—the susceptibility of the connector to be displaced from its proper position. Even one of the designers believes housing of the fire control parts is incorrectly designed.

21. When questioned about this susceptibility shown in Remington's own high-speed video footage, Remington engineer Michael Keeney offered the following:

> Q. In those frames, does the connector appear to be separated from the trigger body?
>
> A. Yes.
>
> Q. And if debris is inside the housing, that would provide an opportunity for debris to come between the connector and the trigger body; correct?
>
> A. That is correct.

6

Deposition of Remington engineer Michael Keeney, *Williams v. Remington.*

    22.    Derek Watkins, another Remington engineer, explained that this defect could lead to a dangerous situation:

> Q. If the trigger doesn't return for whatever reason to full engagement. . . , that is not safe; would you agree with me? Because the gun is now more susceptible --
>
> A. It is more—it is more sensitive, yes; it is more sensitive.
>
> Q. It is more sensitive to forces that would jar the rifle in such a way for that engagement, basically, for the trigger no longer to be underneath the sear and the gun to discharge?
>
> A. Yes.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington.*

    23.    James Ronkainen, another Remington engineer, also admits that failure of the connector to properly engage leads to a dangerous condition:

> Q. One common factor in a fire on safe-release and a theoretical firing on bolt-closure is that the connector is not in its appropriate condition — position; correct?
>
> A. Yes. It is unable to support the sear.

Deposition of Remington engineer James Ronkainen, *Williams v. Remington.*

    24.    This dangerous condition caused Remington to embark on redesign efforts many times in the 1980's and 1990's. The goal of these efforts was to eliminate the defect:

> Q. The goal while you were there was to — is to achieve a design that did not result in a fire on safety-release; is that correct?
>
> A. The design was to eliminate any type of-- any type of debris or any type of firing from that standpoint. Fire on bolt-closure, yeah, we did-- we definitely did not want that to happen.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington.*

7

25. When Remington again contemplated a recall of the Model 700 rifle (and similar firearms) in the mid-nineties, Kenneth D. Green, Manager of Technical & Consumer Services, drafted a forthright warning letter to owners of Remington rifles, which included the following language (emphasis in original):

> "This safety notice is being sent to be sure you understand that if your Model 700, Model Seven or Model 40X rifle is loaded, the gun may accidentally fire when you move the safety from the "safe" position to the "fire" position, or when you close the bolt."

26. Mr. Green sent the draft warning to Remington's Bob Lyman for approval. Mr. Lyman did not approve the draft. Instead, he wrote in the margin to the left of the above language, "Needs to be rewritten; too strong." Mr. Lyman, likely speculating that the language would hurt sales or confirm Remington's knowledge of the defect, ensured that Remington's customers never received the warning.

27. Remington's defective fire control also could have been redesigned to eliminate the harm or danger very inexpensively. Several companies sell connector-less replacement triggers for the Model 700. There is no valid engineering reason why the successfully utilized connector-less designs could not have been used by Remington in its Model 700 and 710.

28. Remington has recently removed the connector for its Model 700 rifles with a newly designed trigger mechanism, the X-Mark Pro. That design was completed in 2002 and slowly rolled into the Model 700's beginning in 2007. Even Remington's past President and CEO, Thomas L. Millner, agreed in his 2007 deposition that the X-Mark Pro is a safer design (Question: "Did [Remington] make a safer fire control with the X-Mark Pro?" Answer: "Yes, I believe so.").

29. Not only did Mr. Millner admit that the design is safer, he admits that the new design prevents the rifle from firing upon release of the safety (Question: "And this new design

8

precludes [fire on safety release] from occurring, true?" Answer: "True."). Finally, he admits that the old design—the design placed into the Subject Rifles even after Remington had the new design—does not have safety features precluding fire on safety release (Question: "And that's the fire control that does not have the safety features that preclude the fire on safe release, true?" Answer: "That's correct."). But Remington still has not taken action to include the new fire control in all of its bolt action rifles or even warn the public regarding a known safety issue. Remington still uses the old fire control today, knowing that it is subjecting users to the gravest of dangers.

30. Jury verdicts and appellate court opinions provide a succinct account of Remington's long-standing knowledge of its defective fire control.

31. On March 24, 1992, The United States Court of Appeals, Ninth Circuit, affirmed a jury verdict of $724,000 in a case alleging discharge on bolt closure. *Campbell v. Remington Arms Co.*, 1992 WL 54928, *2 (C.A. 9 (Alaska) 1992) (unpublished opinion).

32. On December 31, 1992, the Texas Supreme Court, in *Chapa v. Garcia*, 848 S.W.2d 667, 671-74 (Tex. 1992), specifically describes Remington's fire control as "defective":

> Luis Chapa clearly established the relevance of and his need for the documents, by offering evidence demonstrating that the NBAR program had as its goal improvement of the defective fire control on the Model 700 and that Chapa faced a significant time gap in the record as to Remington's *knowledge* of the defect (footnote omitted). Included in Chapa's showing was:
>
> • a 1985 Remington memorandum describing the NBAR program as one to design a "replacement for the Model 700".
>
> • another Remington memorandum declaring that an improved fire control be installed in the Model 700 no later than October 1982 "to put us in a more secure position with respect to product liability."
>
> • a memorandum evidencing an increase of $130,000, in early 1981, in the research budget for development of an improved Model 700 fire control.

9

- proof of the abrupt discontinuation of further research into the fire-control system of the Model 700 after December 1981 coincident in time with the commencement of the NBAR program.

- deposition testimony that models of new, improved fire controls had been designed and assembled as part of NBAR, that prototypes had been built and tested, and that the NBAR fire controls could be retrofitted to the Model 700.

- Remington's admission that the fire control alternatives under consideration in the NBAR program and those it claims were geared solely to the Model 700 "attempt to execute the same *idea* (simultaneous blocking of the sear and trigger)" (footnote omitted).

- Remington's concession that the fire-control system research adopted the name "NBAR" in "late 1980 or 1981," about the time of the substantial increase in research funds for the Model 700 fire-control system.

- Remington's admission that "NBAR components which are or have been under consideration include a ... different fire control."

- Statements by Remington that NBAR information has relevance to the relative safety of its models compared to its competitors and the possible need for warnings.

33. Then, on May 7, 1994, a Texas jury rendered a verdict after Glenn Collins lost his foot to a Model 700 accidental discharge (Fire on Safety Release allegation). Not only did the jury find that the fire control was defective, it also awarded $15,000,000 in exemplary damages. The total verdict, which was in excess of $17 million, sent a clear message to Remington—past and *certainly* future use of the defective fire control is unacceptable.

34. It is difficult to ascertain exactly how many times Remington has embarked on designing a new Model 700 fire control. It clearly tried with the "NBAR" program, and it clearly tried on several occasions in the 1990's, and it clearly again tried beginning in approximately the year 2000. By 1995, Remington openly acknowledged the need to "fix" the fire control. As its documents show, it decided to "[e]liminate 'Fire on Safety Release'

10

malfunction."

35. Before work continued on a new fire control, Remington's Fire Control Business Contract (January 27, 1995) outlined the project and foreshadowed its end:

> The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against **inadvertent or negligent discharges**.
>
> . . .
>
> The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that **enhance the safety attributes** of our firearms.

36. The following paragraph of Remington's January 27, 1995, memo, however, laments that safety "is not considered a highly marketable feature." The next full paragraph in the document speaks for itself. Under "<u>Financial Analysis</u>" appears this telling quote:

> This is where the rubber meets the road. Is this project worth doing? What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits?

37. The project to "enhance the safety attributes of our firearms" is only "worth doing" if Remington can "insure profitability." True to form, the M700 Improvements Program was cancelled on August 28, 1998.

38. Remington has repeatedly made a clear economic choice against recalling the Model 700. But the Model 710 was to be a new rifle. In 1997, and against this sordid and costly fifty-year historical backdrop, Remington faced an important but easily answered question regarding the new low cost bolt-action rifle it intended for beginner users: What fire control should Remington use?

39. When embarking on the design of the Model 710, Remington originally elected against the use of the Model 700 fire control, which contains the connector. Instead, Remington embarked on the design of a "connectorless" fire control.

11

40. Derek Watkins, a Remington Engineer, designed a connector-less fire control based on the work performed during the cancelled M700 improvements program. Watkins touted the benefits of his new design within Remington.

41. Once again, Remington had a new and safe design. But the design was allegedly too expensive to implement, and project spending was put on hold in May 1998.

42. Even though Watkins design was favored within Remington, the engineering department could not get approval for the economics of the project.

43. In August 1998, Watkins' safe design was abandoned due to an estimated cost increase. Motivated once again by the prospect of saving money and increasing its profit margin, Remington decided to pull the unsafe Model 700 fire control off the shelf and use it in the new Model 710 to eliminate development cost and time. This is the <u>same</u> fire control that it had specifically rejected for the new rifle 18 months earlier.

44. As Remington began its internal testing of the new Model 710 (with the defective and dangerous Model 700 fire control installed), it is important to note that Remington, knowing the history of the design, even warned its Model 710 testers of the possibility of inadvertent discharge.

45. No such warning is provided to customers that purchase the Model 710. And the Model 710 *did* fire on bolt closure and on safety release during testing.

46. Remington Consumer Team Meeting minutes from December 13, 2001 reveal that Remington actually planned for personal injuries of its customers as a result of inadvertent discharge from Model 710 rifles:

- **Safety/Injury Calls and the Model 710 - Ken**
  If a consumer calls with a safety concern, (i.e. FSR, fires when closed, personal injury or property damage, etc), these calls AND firearms go to Dennis or Fred.

12

47. Predictably, Remington began receiving reports of injury and accidental discharge from a fire control almost identical to the Model 700 fire control.

48. Remington is defiant in its reluctance to recall its defective Walker fire control, a product that it knows is dangerous and that will kill or injury again, through no fault of the unsuspecting user. The two or more "replacement campaigns" (recalls) contemplated by Remington were seen as too expensive. Remington has elected to defend its product in court rather than embark on a recall that would likely save lives.

49. No government agency can force Remington to recall its product, and Remington has made its internal customer service advisors aware of that fact. It is only through the court system that Remington may be made to answer for its product.

50. Remington has consistently elected against a recall of its dangerous product for financial reasons, even though it is has designed a new product that removes the problematic connector and eliminates the danger. Even Remington's past President admits that the new design is safer. This is improper, and Remington should recall all of its rifles containing a "Walker"-based fire control.

IV.

CLASS ALLEGATIONS

NUMEROSITY

51. Based upon information and belief, Defendant has sold millions of Model 700 rifles to individuals like Plaintiff, which utilizes the defective "Walker" fire control system. Consequently, the persons or businesses in the Class are so numerous, consisting of at least one thousand consumers, that the sheer numbers of aggrieved persons makes joinder of all such persons impracticable, and the disposition of their claims in a class action, rather than in

13

individual actions, will benefit the parties and the Court and is the most efficient and fair way to resolve the controversy.

## COMMONALITY

52. There is a well-defined commonality of interest in the questions of law and/or fact involving the Plaintiff and the class in that

(a) Rodgers and the putative class all purchased or owned the same type of Subject Rifle;

(b) All of the "Walker" fire control systems were equipped with the same defective components, as herein alleged;

(c) Rodgers and all putative class members are claiming damages and/or rights under the same warranty provisions as alleged herein;

(d) The Defendant is alleged to have breached its warranty of merchantability and/or fitness for particular purpose with respect to the Subject Rifles; and

(e) Defendants are alleged to have breached their express warranties with respect to the Subject Rifles.

## PREDOMINANCE

53. The common questions of law and fact predominate over any individual questions, or over any questions that affect only the representative Class member, if there is any differentiation at all.

## TYPICALITY

54. The claims of the Plaintiff are typical of those of the Class in that Plaintiff and those similarly situated seek damages that form the basis of said claims that were caused through the same or similar type of contract and/or transaction involving the Plaintiff (namely the sale of the defective Subject Rifles), and the herein-referenced violations of law were the product of the same underlying fundamental improper conduct perpetrated through the same instrumentality of

14

harm (the defective components warranted by the same warranties, all of which were given to Plaintiff and those similarly situated).

### ADEQUACY

55. The Plaintiff will fairly and adequately represent the interests of the Class and has no interests antagonistic to the Class, and his counsel is experienced and knowledgeable in complex class-action litigation.

### SUPERIORITY

56. There is no plain, speedy or adequate remedy other than maintenance of this Class action since Plaintiff is informed and believes that the prosecution of individual remedies by members of the Plaintiff class would tend to establish inconsistent standards of conduct for Defendant, would lead to inconsistent legal and factual adjudications, and would result in impairment of class members' rights and the disposition of their interest in actions to which they were not parties. Class action treatment is superior to any other means of handling these claims.

### MANAGABILITY AND ASCERTAINABILITY OF THE CLASS

57. Plaintiff does not foresee any difficulties in the management or ascertainability of the case as a Class action. All putative Class members are individually identifiable through the records of the Defendant and its retailers. The Class, if certified, will proceed as an opt-out class and any class member not wanting to be bound may opt out should he or she choose to do so.

### V.

### FIRST CLAIM FOR RELIEF FOR BREACH OF EXPRESS WARRANTY AS AGAINST REMINGTON

58. The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

15

59. Plaintiff and the Class Members were issued an express warranty by Remington. Specifically, Remington warranted that its guns "will be free from defects in material and workmanship." Under its warranty, Remington agreed to repair and/or replace the warranted components during the period specified. Yet, Remington knew that the Subject Rifles were defective at the time they were sold to Rodgers and others similarly situated, but Remington hid that fact from Rodgers and the Class Members.

60. Remington breached its express warranty by providing Plaintiff and the Class Members with rifles containing defective fire controls and then refusing to recall the firearms containing these defective fire controls, even after sufficient knowledge that there was a defect that could potentially cause an unintentional discharge of the firearm and impose serious harm, including possible death, upon any individual near the firearm.

61. By virtue of its knowledge of the defects, demands from purchasers, and its experience with the purchasers of the rifles containing the defective "Walker"-based fire control who complained of the unintended discharge, Remington has received notice of the breach of the warranties.

62. As a result of the foregoing, the Plaintiff and Class Members have suffered damages that were directly and proximately caused by the defects in Remington's rifles containing the "Walker"-based fire control. Plaintiff and the proposed Class Members are entitled to damages in the aggregate amount in excess of $5,000,000.00

VI.

### SECOND CLAIM FOR RELIEF FOR BREACH OF IMPLIED WARRANTY AGAINST REMINGTON

63. The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

64. Remington impliedly represented and warranted that its rifles were free of defects; of merchantable quality; and/or fit for their intended purpose. Remington warranted it would provide Plaintiff and the Class Members with firearms that were in proper working order and that were fit for their intended purposes. This included the "Walker"-based fire control systems. Remington is further obligated to inform its purchasers that the firearms containing the defective fire control system contain a defect, and to recall these firearms for the safety of the owners and those around him.

65. Remington breached these representations and implied warranties because the defective "Walker"-based fire control system installed on its rifles purchased by Plaintiff and Class Members were defective and made the rifles unsafe for its users and those around the user.

66. By virtue of its knowledge of the defects, demands from purchasers, and its experience with purchasers of the rifles containing the "Walker"-based fire control systems who complained of the defect in the rifles, Remington has received notice of the breach of implied warranties.

67. As a result of the foregoing, the Plaintiff and the Class Members have suffered damages that were directly and proximately caused by the rifles containing the "Walker"-based fire control systems. Plaintiff and proposed Class Members are entitled to damages in the aggregate amount in excess of $5,000,000.00.

WHEREFORE, Plaintiff, and those similarly situated, pray for judgment as follows:

On First Claim for Relief:

1. For special damages as an aggregate in excess of $5,000,000.00

2. For prejudgment interest, and

3. For reasonable attorneys fees, and

4. For costs of suit incurred herein, and

5. For such other and further relief as the Court deems just and proper.

On Second Claim for Relief:

1. For special damages as an aggregate in excess of $5,000,000.00

2. For prejudgment interest, and

3. For reasonable attorneys fees, and

4. For costs of suit incurred herein, and

5. For such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: 12/10/09

Respectfully Submitted,

**GARY M. DRAPER**
Arkansas State Bar No. 75035
**GRIFFIN, RAINWATER & DRAPER, P.L.C.**
310 Main Street, P.O. Box 948
Crossett, Arkansas 71635
Telephone: (870) 364-2111
Facsimile: (870) 364-3126
Email: gmdraper@windstream.net

**ADAM Q. VOYLES**
Texas State Bar No. 24003121
**HEARD ROBINS CLOUD BLACK
& LUBEL, LLP**
3800 Buffalo Speedway, 5th Floor
Houston, Texas 77098
Telephone: (713) 650-1200
Facsimile: (713) 650-1400

Email: avoyles@heardrobins.com

**STEPHEN W. DRINNON**
Texas State Bar No. 00783983
**THE DRINNON LAW FIRM, PLLC**
1700 Pacific Avenue
Suite 2230
Dallas, Texas 75201
(972) 445-6080 (Telephone)
(972) 445-6089 (Facsimile)

**JEFFREY W. HIGHTOWER, JR.**
Texas State Bar No.  00793951
**HIGHTOWER LAW FIRM**
9400 North Central Expressway
Suite 1207
Dallas, Texas  75231
Phone:  214.580.9800
Fax:  214.580.9804
E-mail:  jeff@hightowerlawoffice.com

**COUNSEL FOR PLAINTIFF**